*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
July 17, 2026
10:17 AM

Plaintiff-Appellee,

v

No. 373912
Lapeer Circuit Court
LC No. 2023-014542-FC

GAETANO PEPE,

Defendant-Appellant.

Before: GADOLA, C.J., and BOONSTRA and CAMERON, JJ.

PER CURIAM.

Defendant was convicted after a bench trial of six counts of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(2)(b), MCL 750.520b(1)(b), three counts of third-degree criminal sexual conduct (CSC-III), MCL 750.520d(1)(d), and as a second offense habitual offender, MCL 769.10. Defendant was sentenced to concurrent terms of 25 to 40 years in prison for three of the CSC-I convictions, 22 years and six months to 40 years in prison for three of the CSC-I convictions, and 10 years to 22 years and six months in prison for each of the CSC-III convictions. Defendant appeals as of right. We affirm.

## I. FACTS

In 2021, 22 year-old CE reported that defendant, her stepfather, had sexually abused her throughout her childhood. CE reported that when she was eight or nine years old, defendant moved into the family home and later married CE's mother. CE testified that defendant began to sexually abuse her when she was approximately 10 years old. CE testified that defendant began the abuse by touching her vaginal area but progressed over time to partial penetration and then to full penile-vaginal intercourse. According to CE, her mother worked long hours and rarely was home; defendant received disability, did not work, and was present in the home most of the time.

CE testified that she and defendant regularly had sex in various places in the family home, including bedrooms and bathrooms. She also testified that defendant often called the school to excuse her absence from school; CE testified that one day when she was in sixth grade, she did not go to school and "we put restraints on the bed frame and we had sex all day that day." CE testified that she believed herself to be in love with defendant and wanted a permanent romantic relationship

-1-

with him. She testified that he "spoiled" her with gifts and did her schoolwork for her. He also provided her with cigarettes, alcohol, prescription painkillers, and Xanax; she testified that she started smoking cigarettes that he provided to her when she was eight years old, and he gave her Percocet and Vicodin as early as age 11.

In eighth grade, CE began online homeschooling and therefore was frequently alone in the home with defendant all day. CE testified that her performance at school was poor, and she had to retake the ninth grade curriculum. She attempted to resume public school but eventually failed due to poor attendance. She testified that defendant would call the school to excuse her absence and she then would stay home and have sex with him instead of attending school. She eventually failed academically and left school without graduating.

CE testified that when she was 15 or 16 years old, defendant became increasingly controlling and possessive of her and became verbally and physically abusive. She testified that he called her profane names, threw rocks at her, slapped her so hard that she fell to the ground, and would hold her down and hold his cane on her throat until she would lose consciousness. She began declining his sexual advances but would relent after he argued, begged, and berated her for hours. After CE was 18 years old, the relationship continued as a consensual relationship until in late 2020, CE left the family home and moved in with her half-sister. According to CE, defendant continued to call, text, and write to her, and to confront her whenever he saw her. CE told defendant that if he did not stop contacting her, she would report the sexual abuse; defendant then threatened to kill her. In 2020, CE told a friend about her relationship with defendant and learned for the first time that the relationship was inappropriate. She eventually became very distressed and was hospitalized. CE thereafter reported the abuse to the police.

Defendant was charged with three counts of CSC-I under MCL 750.520b(2)(b) (victim under age 13, defendant 17 or older), three counts of CSC-I under MCL 750.520b(1)(b) (victim less than age 16, defendant member of same household), three counts of CSC-III under MCL 750.520d(1)(d) (defendant related to victim by blood or affinity), and as a second-offense habitual offender, MCL 769.10. Defendant was appointed counsel who requested a competency examination, which the trial court ordered. After receiving the report from the competency examination, the district court found defendant competent to stand trial. Shortly thereafter, defendant's appointed counsel, Ramsey Mashni, moved to withdraw as counsel because there was a breakdown in the attorney/client relationship. The district court granted counsel's motion and appointed new counsel, Meagan Stamell, for defendant.

Defendant waived arraignment while represented by attorney Stamell. At the preliminary examination, the prosecution stated on the record that defendant had been offered a plea agreement whereby the prosecution would dismiss all charges except one count of CSC-I if defendant pleaded guilty to that charge with a mandatory minimum of 25 years in prison, and that defendant had rejected the offered plea agreement. At the conclusion of the preliminary examination, the district court bound defendant over for trial.

In April 2024, attorney Stamell moved to withdraw as defendant's counsel at the request of defendant, stating that there had been a breakdown in the attorney/client relationship. At the hearing on the motion, attorney Stamell explained:

I do think that the request is appropriate. We have some significant challenges that have been raised about defense strategy. My client – I thought we were on the same page about defense strategy and my client advised that we were not.

I can't go into too much detail, which kind of puts me in a difficult position just because of attorney/client privilege. . . . He was the one who brought up his request for a new attorney.

He does face a mandatory 25 years in prison upon conviction, as well as likely deportation. So given that, you know, I understand, I'm sure, the hesitations of the Court, but I think Mr. Pepe deserves to have an attorney who's able to be on the same page with him in terms of his strategy and approach to this case.

Defendant confirmed to the trial court that he was requesting a new attorney. The trial court granted the motion, cautioning defendant that this was the last counsel the trial court would appoint to represent him in this matter. The trial court thereafter appointed attorney Josh West to represent defendant. Attorney West's motion to withdraw as defendant's counsel was heard by the trial court on July 29, 2024. Attorney West stated that there had been a breakdown in communication between him and defendant and that there was "disagreement in terms of strategy and how to proceed forward, and unfortunately I think there's a lot of things my client wants that I legally and ethically cannot do."

The trial court explained to defendant that the trial was going forward and no more delay was permitted given that defendant had been in jail awaiting trial for over 800 days. The trial court observed that each time the eve of trial approached, defendant became dissatisfied with his appointed counsel and sought the appointment of new counsel, further delaying trial. The following colloquy occurred, in relevant part:

> *The Court*: And so this is your opportunity, Mr. Pepe. If you want an opportunity to represent yourself, you just need to tell the Court now. If not, Mr. West, as unenviable a position as you may find yourself, you are Mr. Pepe's attorney. And so, Mr. Pepe, what are your thoughts?
>
> *Defendant*: I get to represent myself with counsel?
>
> *The Court*: You could, that is an option. I could appoint Mr. West as what's called standby counsel. You represent yourself. So that's an option for you. But then if you decide you want to go down that road, I've got to let you know a whole bunch of other things about what it is and how you go about representing yourself.
>
> *Defendant*: Sounds good to me.
>
> * * *
>
> *The Court*: So, Mr. Pepe, like I indicated that is something that's an option. There are major pitfalls to representing yourself in court when you're not a lawyer. There are certain things that, frankly, I'm probably not going to let you do. I mean I'm not going to let you pick the jury. You're going to have to submit your

proposed jury questionnaire to the Judge, me, and I'm going to read that information to the jury. I mean there are certain things that are going to come up during the course of the case that will be handled differently if you're representing yourself.

*Defendant*:    Okay.

*The Court*:    And so it's not easy . . . representing people when you are a lawyer, let alone trying to represent yourself when you're not one. . . . there are definite pitfalls to represent[ing] yourself in court when you don't know the rules, quite frankly.

*Defendant*:    Oh, I've been through a lot of court proceedings.

*The Court*:    Okay. Well then let me ask you, maybe this will resolve it. Would you like to represent yourself in connection with this case?

*Defendant*:    Yes, I would.

*The Court*:    Okay. And so now I need to go over – I've got to find those factors. Anybody have the Young (phonetic) factors available for them?

*Mr. West* [defense counsel]:   I do not.

*The Court*:    I apologize, folks, I did not know we were going to end up in this place. So give me just a minute. . . . I think I can come close. All right. So, Mr. Pepe, first of all, you understand you have a constitutional right to be represented by an attorney, correct?

*Defendant*:    Yes

*The Court*:    And you, [as] Mr. West has explained, at the taxpayer's expense, because it's the Court's understanding that you're not able to afford one on your own, is that correct?

*Defendant*:    Right.

*The Court*:    All right. And so going forward, I mean as much as you have a right to be represented by counsel, you also have a right to represent yourself in connection with this matter. And you understand that?

*Defendant*:    Yep.

*The Court*:    All right. And are you indicting to the Court that at this point in time you'd like to represent yourself in connection with this case?

*Defendant*:    Yes.

*The Court*:     All right.  You understand that if the Court grants your request and that you represent yourself in this matter you are not going to be represented by an attorney.  Do you understand that?

*Defendant*:      Yep.

*The Court*:     Even if the Court appoints what is called standby counsel, it's just that.  It's someone for you to consult with.  For example, if that's Mr. West, he is not trying your case.  He's not here to ask questions of witnesses or do anything on your behalf other than answer your questions.

*Defendant*:     Yes.

*The Court*:     You understand that?

*Defendant*:     Yes.

*The Court*:     Okay.  And that's a process you would like to continue to proceed, you'd like to go down that road?

*Defendant*:     Yep.

*The Court*:     You understand that your trial is in less than a month?

*Defendant*:      Yes.

*The Court*:     Okay.  And you are going to then need to be able to be in a position to represent yourself in the case, if you do that and if the Court agrees.  And so you think you're going to be able to be in a position to represent yourself in connection with this matter?

*Defendant*:     Sure.  Yes.

*The Court*:     Okay.  And there may be situations that arise during the course of the case that you are not familiar with the court rules.  There's a whole  rule book that lawyers have to follow.  You understand that?  You're nodding your head yes.  Is that a yes?

*Defendant*:     Yes.

*The Court*:     Likewise at trial there is a whole book of things called the Rules of Evidence.  And the Rules of Evidence are applicable at trial and to you if you represent yourself even though you're not an attorney.  You understand that?

*Defendant*:     Yes.

* * *

*The Court*: And knowing that going forward representing yourself, not being familiar with the court rules or the Rules of Evidence it can be a difficult proposition. You understand that?

*Defendant*: Yes.

*The Court*: Okay. And despite that you believe that it's in your best interests to represent yourself in connection with this case?

*Defendant*: Ah, yes.

*The Court*: Well, you're hesitating and you should. But I'm also going to tell you that I haven't really looked at this because like I said, I didn't expect that we would be at this point in this case at this particular moment. There may be some limitations that the Court places on you with respect to questioning the alleged victims. I may or may not allow you to question the alleged victims. And so, Mr. West, I guess if you are the one that's appointed standby counsel, you might have to sub in for Mr. Pepe at that point in time, because I don't know enough about his case at this point, but it's a distinct possibility I won't allow it.

*Defendant*: Well, that's the part that I don't understand. How am I going to be judged at a trial when it's only one sided here. That's why I can't go with the attorneys because they're only looking at one side of the case. . . . I know the case better than anybody. So I think I'd be just fine.

\* \* \*

*The Court*: . . . But the allegations are pretty, pretty serious with respect to sexual allegations, and given the fact that that is the underlying basis of this case – I mean I'm not saying I will, but I'm saying there may be a situation where I say to Mr. Pepe, it's not appropriate for you to question the alleged victims in this case. And so also, Mr. Pepe, you need to understand too that if you are disruptive, don't follow the rules, anything like that at all, that means that if the trial process itself is disrupted by you and your behavior, I have the right to deny you the ability to represent yourself and appoint you a lawyer right then and there.

*Defendant*: Yes.

\* \* \*

*The Court*: . . . And so this is one of those circumstances where – Mr. Pepe if knowing all of these things, all of these restrictions, all of these rules still leads you to believe that it's in your best interest to represent yourself in connection with this case, the Court is inclined to give you that opportunity. So I'll ask you one last time, is this what you want to do?

*Defendant*: Yes.

Thereafter, at the hearing held August 20, 2024, defendant waived his right to jury trial. At that hearing, the prosecutor advised the trial court in defendant's presence that an offer had been made that "would require the mandatory/minimum of 25 years" and that "we have several of those counts."

Trial began on August 27, 2024, and the trial court again asked defendant if he still wanted to represent himself, and defendant stated that he did. The trial court then asked defendant that "You understand that this is a very serious offense and that you're looking at, potentially if convicted, up to 25 years to life. You understand that?" Defendant replied that he understood. In her opening statement, the prosecuting attorney then stated the charges against defendant in detail.

At trial, CE testified regarding the abuse by defendant. The prosecution also introduced recordings CE had made of certain of her conversations with defendant in which defendant acknowledged that the relationship had occurred and the timeframe in which it had occurred. CE's mother, aunt, and sister also testified, corroborating certain aspects of CE's testimony. The sheriff's deputy who investigated the case also testified, as well as a Michigan State Police trooper who investigated the case.

In making his opening statement, defendant stated in part that "one of the charges against Defendant could result in a life sentence." Defendant testified at trial and acknowledged that the recorded conversations introduced at trial included his voice. He also acknowledged that he had a sexual relationship with CE, but only after she was an adult; defendant stated that he did not know when the consensual relationship began or how old CE was when it began. At the conclusion of the testimony, the trial court found defendant guilty of all charges. Defendant thereafter was sentenced as noted. Defendant now appeals.

## II. DISCUSSION

Defendant contends that the trial court failed to comply with mandatory prerequisites necessary to support a finding that defendant knowingly and intelligently waived his right to counsel. We disagree.

We review de novo whether a defendant validly waived the right to counsel, while reviewing for clear error the trial court's findings of fact regarding whether defendant's waiver was knowing and intelligent. *People v Williams*, 470 Mich 634, 640; 683 NW2d 597 (2004). A factual finding is clearly erroneous if we are left with a definite and firm conviction that the trial court made a mistake. *People v Jarrell*, 344 Mich App 464, 474; 1 NW3d 359 (2022). Whether a trial court's deviation from the court rule governing the initial waiver of the right to counsel warrants reversal depends upon the nature of the deviation from the court rule. *People v Lane*, 453 Mich 132, 139; 551 NW2d 382 (1996).

A defendant in a criminal prosecution facing incarceration has the right to counsel at all critical stages of the criminal proceedings. US Const, Ams VI and XIV; Const 1963, art 1, § 20; *People v King*, 512 Mich 1, 11; 999 NW2d 670 (2023). "Absent a defendant's valid waiver of their right to counsel, deprivation of counsel during critical stages of the criminal proceedings is a structural error subject to automatic reversal, even when a defendant formally requests to represent himself." *Id*. at 4. Trial is one of the critical stages of criminal proceedings. *Id*. at 11. The

federal and state constitutions similarly protect the right of self-representation, however, and "[c]hoosing self-representation necessarily requires waiving the right to be represented by counsel." *Id*.

The question in this case is whether defendant effectively waived his right to counsel. To exercise the right to self-representation, the Constitution requires a defendant to give a "knowing, voluntary, and intelligent waiver" of the right to counsel. *Id*., quoting *Iowa v Tovar*, 541 US 77, 87-88; 124 S Ct 1379; 158 L Ed 2d 209 (2004). For a defendant to validly waive the right to counsel, the trial court must substantially comply with the factors set forth in *People v Anderson*, 398 Mich 361, 367-368; 247 NW2d 857 (1976), as well as MCR 6.005(D). *King*, 512 Mich at 11. Under *Anderson*, the trial court must find that (1) the defendant's request to represent himself is unequivocal, (2) the defendant is asserting the right knowingly, intelligently, and voluntarily after being informed of the dangers and disadvantages of self-representation, and that (3) the defendant's self-representation "will not disrupt, unduly inconvenience and burden the court and the administration of the court's business." *King*, 512 Mich at 11-12 (quotation marks and citation omitted).

In addition, MCR 6.005(D) states that the trial court may not permit the defendant initially to waive his right to counsel without first:

    (1) advising the defendant of the charge, the maximum possible prison sentence for the offense, any mandatory minimum sentence required by law, and the risk involved in self-representation, and

    (2) offering the defendant the opportunity to consult with a retained lawyer or, if the defendant is indigent, the opportunity to consult with an appointed lawyer.

Substantial compliance requires that the trial court "discuss the substance of both *Anderson* and MCR 6.005(D) in a short colloquy with the defendant, and make an express finding that the defendant fully understands, recognizes, and agrees to abide by the waiver of counsel procedures." *People v Adkins (After Remand)*, 452 Mich 702, 726-727; 551 NW2d 108 (1996), overruled in part on other grounds, *Williams*, 470 Mich at 641 n 7. We observe that the requirements set forth in *Anderson* and MCR 6.005(D) "are merely vehicles to ensure that the defendant knowingly and intelligently waived counsel with open eyes." *Adkins*, 452 Mich at 725. While the trial court must discuss the substance of *Anderson* and MCR 6.005(D) with the defendant, there is no requirement of a specified "litany." *Id*.

In this case, the record indicates that the trial court substantially complied with the substance of *Anderson*. The trial court engaged in a lengthy colloquy with defendant in which the trial court repeatedly asked defendant if he was requesting to represent himself, discussed at great length with defendant the perils of self-representation, and described in detail the limitations the trial court would place upon defendant's actions at trial, such as his cross-examination of the victim. The trial court also cautioned defendant that his self-representation would not be allowed to disrupt, unduly inconvenience, or burden the trial court's conduct of the trial. Defendant consistently and repeatedly assured the trial court that he understood the trial court's warnings regarding the pitfalls of self-representation and was unequivocal in his decision to represent himself.

The trial court also substantially complied with the requirements of MCR 6.005(D). Although the trial court did not at the time of his initial waiver advise defendant of the charge, the maximum possible prison sentence for the offense, or the mandatory minimum sentence required by law, MCR 6.005(D)(1), the record indicates that defendant earlier waived the trial court's reading of that information at the arraignment while represented by counsel. During its colloquy with defendant at the initial request, the trial court advised defendant that the charges were "pretty, pretty serious with respect to sexual allegations." At the beginning of the first day of trial, the trial court again advised defendant of the dangers of self-representation and cautioned defendant that "[y]ou understand that this is a very serious offense and that you're looking at, potentially if convicted, up to 25 years to life. You understand that?" Defendant replied that he understood.

The record also is replete with instances where the severity of the charges and the potential penalty was discussed with defendant and in defendant's presence. On the first day of trial, immediately after the trial court again questioned defendant about whether he wanted to represent himself, the prosecuting attorney gave her opening statement in which she stated the charges against defendant in detail. In making his opening statement at trial, defendant stated in part that "one of the charges against Defendant could result in a life sentence" indicating that he was aware of the potential sentence. And at an earlier hearing, attorney Stamell, while representing defendant, stated on the record in defendant's presence that defendant was facing a mandatory minimum sentence of twenty-five years imprisonment, and defendant acknowledged that he had rejected the plea agreement offered by the prosecution because it included a sentence of twenty-five years, suggesting that he did not consider the mandatory minimum sentence an adequate offer.

We conclude that under the circumstances of this case, the trial court substantially complied with the requirements of *Anderson* and MCR 6.005(D), and the trial court's failure to "specifically address the charged offense and the range of possible punishment [at the initial waiver] is not enough to defeat a finding of substantial compliance with the waiver procedures in this case" *Adkins (After Remand)*, 452 Mich at 731. Because the trial court substantially complied with the requirements of *Anderson* and MCR 6.005(D), defendant failed to establish that his waiver of the right to counsel was invalid.

Affirmed.


/s/ Michael F. Gadola
/s/ Mark T. Boonstra
/s/ Thomas C. Cameron